1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ANGELA BLAKE-NORMAN,           ) Case No. CV 13-6456-JPR
                               )
              Plaintiff,       )
                               )
         vs.                   ) **MEMORANDUM OPINION AND ORDER**
                               ) **REVERSING COMMISSIONER**
CAROLYN W. COLVIN, Acting      )
Commissioner of Social         )
Security,                      )
                               )
              Defendant.       )
_____)

18   **I.   PROCEEDINGS**

19        Plaintiff seeks review of the Commissioner's final decision

20   denying her application for disability insurance benefits

21   ("DIB").  The parties consented to the jurisdiction of the

22   undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  This

23   matter is before the Court on the parties' Joint Stipulation,

24   filed June 26, 2014, which the Court has taken under submission

25   without oral argument.  For the reasons discussed below, the

26   Commissioner's decision is reversed and this action is remanded

27   for further proceedings.

28

**II.   BACKGROUND**

On May 28, 2009, Plaintiff filed an application for DIB, alleging that she had been disabled since January 1, 2008, because of the following impairments: "[h]ard of hearing, arthritis, shoulder, breathing problems, depression." (AR 135-36, 150.)  She later added allegations of worsening hearing loss, fibromyalgia, osteoporosis, and "severe" shoulder pain. (AR 187.)  After Plaintiff's application was denied, she requested a hearing before an Administrative Law Judge. (AR 94.)  A hearing was held on January 6, 2011, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. (AR 50-81.)  On July 15, 2011, the ALJ issued a written decision finding Plaintiff not disabled. (AR 28-49.)

Plaintiff thereafter requested review of the ALJ's decision and submitted additional medical evidence. (AR 4, 26, 206-10, 757-877.)  Meanwhile, on December 30, 2011, Plaintiff filed a renewed application for benefits and was found to have been disabled since December 30, 2011. (See AR 2.)  On July 19, 2013, the Appeals Council denied review of the July 15, 2011 decision. (AR 1.)  The council specified that neither "the additional evidence" nor the fact that Plaintiff was "found to be under a disability beginning December 30, 2011," warranted any change in the decision. (AR 2.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.

2

1    Id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v.

2    Astrue, 481 F.3d 742, 746 (9th Cir. 2007).   Substantial evidence

3    means such evidence as a reasonable person might accept as

4    adequate to support a conclusion.   Richardson, 402 U.S. at 401;

5    Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).   It

6    is more than a scintilla but less than a preponderance.

7    Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.

8    Admin., 466 F.3d 880, 882 (9th Cir. 2006)).   To determine whether

9    substantial evidence supports a finding, the reviewing court

10   "must review the administrative record as a whole, weighing both

11   the evidence that supports and the evidence that detracts from

12   the Commissioner's conclusion."   Reddick v. Chater, 157 F.3d 715,

13   720 (9th Cir. 1996).   If the evidence as a whole can reasonably

14   support either affirming or reversing, the reviewing court "may

15   not substitute its judgment" for the Commissioner's.   Id. at 720-

16   21.

17   **IV.   THE EVALUATION OF DISABILITY**

18        People are "disabled" for purposes of receiving Social

19   Security benefits if they are unable to engage in any substantial

20   gainful activity owing to a physical or mental impairment that is

21   expected to result in death or which has lasted, or is expected

22   to last, for a continuous period of at least 12 months.   42

23   U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257

24   (9th Cir. 1992).

25        A.   The Five-Step Evaluation Process

26        An ALJ follows a five-step sequential evaluation process to

27   assess whether someone is disabled.   20 C.F.R. § 404.1520(a)(4);

28   Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as

amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  § 404.1520(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal one in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, she is not disabled and the claim must be denied.  § 404.1520(a)(4)(iv).  The claimant has the burden of proving she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if

_____

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations.  § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

the claimant has no past relevant work, the Commissioner bears
the burden of establishing that the claimant is not disabled
because she can perform other substantial gainful work available
in the national economy. § 404.1520(a)(4)(v). That
determination comprises the fifth and final step in the
sequential analysis. § 404.1520; <u>Lester</u>, 81 F.3d at 828 n.5;
<u>Drouin</u>, 966 F.2d at 1257.

     B.   <u>The ALJ's Application of the Five-Step Process</u>

     At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since January 1, 2008, the alleged
onset date. (AR 33.) At step two, he concluded that Plaintiff
had severe impairments of "right cubital tunnel syndrome, status
post right cubital tunnel release," "status post right rotator
cuff repair," "status post right ulnar nerve decompression,"
"right upper extremity entrapment neuropathy," "status post left
rotator cuff repair," "bi-sensorineural hearing loss," and
fibromyalgia. (<u>Id.</u>) He found that Plaintiff's depression was
not severe. (AR 33-36.) At step three, the ALJ determined that
Plaintiff's impairments did not meet or equal any of the
impairments in the Listing, including those in sections 1.00
(musculoskeletal impairments), 2.00 (hearing impairments), 11.00
(neurological impairments), and 14.00 (immune system
impairments). (AR 36-37.) At step four, the ALJ found that
Plaintiff had the RFC to perform light work with additional
limitations:

     The claimant cannot climb ladders, ropes or scaffolds,
     but she can occasionally climb ramps or stairs. The
     claimant can occasionally balance, stoop, kneel, crouch

5

or crawl.  The claimant can occasionally push, pull, lift or reach overhead with the upper extremities, bilaterally.  The claimant can perform work that does not require concentrated exposure to extreme cold or extreme vibration, or any exposure to hazardous machinery, unprotected heights or other high risk, hazardous or unsafe conditions.  The claimant cannot perform work requiring fine hearing.

(AR 37.)  Based on the VE's testimony, the ALJ concluded that although Plaintiff could not perform her past work as a school secretary, she had transferable skills that would enable her to perform jobs that existed in significant numbers in the national economy.  (AR 42.)  The ALJ therefore concluded that Plaintiff was not disabled.  (AR 43.)

**V.   DISCUSSION**

Plaintiff contends that the ALJ erred in failing to find that Plaintiff's hearing loss met Listing 2.10, rejecting the opinions of two treating physicians that Plaintiff was disabled by chronic pain and other ailments, finding Plaintiff's depression to be nonsevere, and evaluating Plaintiff's credibility and subjective symptoms.  Plaintiff further contends that the Appeals Council erred in failing to consider additional evidence from treating physician Ayal Willner concerning Plaintiff's hearing loss.  (J. Stip. at 3.)  For efficiency and other reasons, the Court addresses Plaintiff's contentions in an order different from that in the Joint Stipulation.

1       A.    The ALJ Erred in Finding Plaintiff's Depression Not to

2             Be Severe, and Remand Is Necessary

3       Plaintiff contends that the ALJ erred in finding that

4  although she "has a mentally determinable mood disorder that is

5  due to her medical condition resulting from her severe physical

6  impairments," it was not severe.  (AR 33; J. Stip. at 22-23, 25.)

7  The Commissioner appears to concede that the ALJ's finding was

8  erroneous but contends that any error was harmless because the

9  ALJ considered Plaintiff's impairments in assessing her RFC.  (J.

10 Stip. at 24 (citing Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir.

11 2007) (finding step-two error harmless when ALJ considered

12 impairment at step four)).)

13      The step-two inquiry is "a de minimis screening device to

14 dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273,

15 1290 (9th Cir. 1996).  The claimant has the burden to show that

16 she has one or more "severe" medically determinable impairments

17 that can be expected to result in death or last for a continuous

18 period of at least 12 months, as demonstrated by evidence in the

19 form of signs, symptoms, or laboratory findings.  See Bowen v.

20 Yuckert, 482 U.S. 137, 146 n.5 (1987); §§ 404.1508,

21 404.1520(a)(4)(ii); Ukolov v. Barnhart, 420 F.3d 1002, 1004-05

22 (9th Cir. 2005).  A medically determinable impairment is "severe"

23 if it "significantly limits [her] physical or mental ability to

24 do basic work activities."  § 404.1520(c); accord § 404.1521(a).

25 "An impairment or combination of impairments may be found not

26 severe only if the evidence establishes a slight abnormality that

27 has no more than a minimal effect on an individual's ability to

28 work."  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005)

7

(citation and internal quotation marks omitted).

The medical evidence of record was sufficient to establish a severe impairment under the "de minimis" threshold. It appears that Plaintiff had received mental-health treatment for depression since at least December 2009 (see AR 673), and as of the time of the hearing, she continued to see a psychiatrist weekly and psychologist monthly and take prescription mental-health medications (AR 33-34; see AR 62, 205). She had received in-hospital treatment for depression with psychotic features and had a reported Global Assessment Functioning ("GAF") score of 38.[2] (AR 34.) Her treating psychiatrist, treating psychologist, and examining psychologist agreed that Plaintiff suffered at least "moderate" mental-health limitations. (See AR 556 (treating psychiatrist noting "marked" limitation in social functioning; "extreme" limitations in daily living and maintaining concentration, persistence, or pace; and four or more episodes of decompensation in previous 12 months); AR 675 (treating psychologist estimating GAF scores in high 50s, indicating moderate symptoms or impairment); AR 733-34 (examining psychologist diagnosing depressive disorder with anxiety,

---

[2] A GAF score of 31 to 40 indicates either some impairment in reality testing or communication or major impairment in several areas, such as work, school, family relations, judgment, thinking, or mood. See Diagnostic and Statistical Manual of Mental Disorders 34 (revised 4th ed. 2000). The Commissioner has declined to endorse GAF scores, Fed. Reg. 50764-65 (Aug. 21, 2000) (GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings"), and the most recent edition of the DSM "dropped" the GAF scale, citing its lack of conceptual clarity and questionable psychological measurements in practice. Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012).

intellectual impairment, possible personality disorder, and moderate psychosocial stressors and estimating GAF of 60); but see AR 424-25 (examining psychiatrist diagnosing mood disorder but no significant limitations).)

Although the ALJ gave valid reasons for discounting some of the evidence (see AR 33-36), Plaintiff presented adequate evidence to establish a severe impairment at step two.  Only impairments "of a minimal nature which could never prevent a person from working" are screened out at step two.  SSR 85-28, 1985 WL 56856, at *2 (Jan. 1, 1985) (internal quotation marks omitted).  In this case, Plaintiff's depression was found to be at least "moderate" by treating and examining mental-health practitioners, and the medical evidence does not establish a duration of less than 12 months.  Cf. Garcia v. Colvin, No. CV 13-8893-E, 2014 WL 3810382, at *5-6 (C.D. Cal. Aug. 1, 2014) (remanding when ALJ found depression nonsevere despite medical opinions that it was at least moderate); French v. Astrue, No. EDCV 09-1489 SS, 2010 WL 2803965, at *6 (C.D. Cal. July 15, 2010) (remanding for further proceedings when ALJ applied more than de minimis test to impairments of depression and anxiety).  The ALJ himself relied on GAF scores indicating some mental-health functioning limitations, before stating, somewhat contradictorily, that he did not give them "great weight."  (See AR 35.)

Although it is true that a step-two error can be harmless when the ALJ accounts for resulting limitations later in the sequential evaluation process, see Lewis, 498 F.3d at 911, here, the ALJ does not appear to have done so.  He inquired at the

1  hearing whether Plaintiff continued to receive mental-health
2  treatment and how often, but he did not ask about her related
3  symptoms and limitations or how her depression affected her daily
4  functioning or would limit her ability to work.  (See AR 62-63.)
5  Nor did the alternative hypotheticals the ALJ posed to the VE
6  contain any limitations attributable to her mental-health
7  impairment.  (See AR 71-76.)  And although he summarized in his
8  decision the evidence of mental-health impairment, he dismissed
9  treatment records and medical opinions suggesting a moderate to
10 severe impairment, including on erroneous grounds.  (See, e.g.,
11 AR 34-35 (dismissing in-hospital treatment for severe impairment,
12 opinion of treating psychiatrist, and limitations found by
13 examining psychologist in part because no evidence existed
14 limitations were expected to last 12 months despite evidence of
15 mental-health treatment and significant findings dating to
16 December 2009); id. (discounting opinion of treating physician
17 because based on only "monthly visits of 10 to 15 minutes" in
18 favor of opinions of nonexamining physician and physician who
19 examined Plaintiff only once).)  Having decided that Plaintiff's
20 depression was nonsevere, the ALJ made no mention of it at steps
21 three, four, or five, even when discussing the opinions of two
22 treating doctors that Plaintiff was disabled, noting limitations
23 caused by her depression.  (See AR 36-41; see also AR 505-06,
24 508, 560-61, 565, 606-09.)

25     It is therefore unclear whether the step-two error was
26 harmless.  See Robbins, 466 F.3d at 885 (noting that ALJ's error
27 is harmless only when "inconsequential to the ultimate
28 nondisability determination").  Accordingly, remand is warranted

10

1  to enable consideration of whether Plaintiff's mental impairment
2  imposes any limitations upon her ability to work. See Garcia,
3  2014 WL 3810382, at *6 (error in finding depression nonsevere was
4  not harmless when RFC and questions to VE assumed "no mental
5  limitations whatsoever").

6      Plaintiff further contends that the ALJ erred in assessing
7  the opinions of treating doctors Eing-Min Chang and Andre
8  Babajanians that she suffered disabling impairments. (J. Stip.
9  at 11-14.)

10     On December 10, 2009, Dr. Chang noted diagnoses of
11 rheumatoid arthritis, osteoarthritis, hearing loss, hypertension,
12 fibromyalgia, and depression. (AR 505.) Dr. Chang opined that
13 Plaintiff was "disabled at this time" and suffered slight to
14 moderate issues with memory and concentration because of her
15 medications and depression. (AR 506, 508.) On April 8, 2010,
16 Dr. Chang signed a letter certifying that Plaintiff had been
17 diagnosed with fibromyalgia, osteoporosis, rheumatoid arthritis,
18 major depression, high blood pressure, and hearing loss. (AR
19 565.) She opined that Plaintiff had been "permanently disabled"
20 since January 2007. (Id.)

21     On July 27, 2009, Dr. Babajanians evaluated Plaintiff for
22 chronic musculoskeletal pain and noted "multiple tender points,"
23 joint swelling, and limited range of motion and pain in both
24 shoulders. (AR 466, 474.) He opined that she likely suffered
25 from fibromyalgia, allodynia,[3] arthritis, gastropathy, and a

26 _____

27     [3] Allodynia describes pain resulting from a stimulus that is
   not normally painful. See Allodynia: When Touch Hurts But
28 Shouldn't, Am. Headache Soc'y, http://www.achenet.org/

1  left-shoulder rotator-cuff tear and ordered additional testing.

2  (AR 474.)  On September 12, 2009, Dr. Babajanians again found

3  multiple tender points and opined that she suffered from

4  fibromyalgia, hearing loss, and osteopenia.  (AR 465.)  On

5  December 2, 2009, he certified that she suffered from

6  fibromyalgia, rheumatoid arthritis, polyarthritis, and lower-back

7  pain and required a cane.  (AR 559.)  On May 24, 2010, he

8  completed a Fibromyalgia Residual Functional Capacity

9  Questionnaire, indicating that his diagnosis of fibromyalgia was

10 based upon Plaintiff's "generalized pain and multiple tender

11 points."  (AR 560, 563.)  He noted several other symptoms,

12 including "constant, severe" bilateral pain in her spine, chest,

13 shoulders, arms, hands, hips, legs, ankles, and feet.  (AR 560-

14 61.)  He also noted impairments of depression, osteopenia,

15 hypertension, and valvular heart disease.  (AR 560.)  He opined

16 that Plaintiff was incapable of even low-stress jobs.  (AR 561.)

17 Dr. Babajanians again noted Plaintiff's depression in late-2009

18 and early-2010 treatment notes.  (AR 606-08.)

19     Among the reasons the ALJ gave for discounting Drs. Chang's

20 and Babajanians's findings was that they were "not consistent

21 with" and "not supported by" the record.  (AR 38.)  It is unclear

22 whether or to what extent the ALJ's assessment of their opinions

23 turned on their inclusion of depression among the impairments

24 that would limit Plaintiff's ability to work.  Accordingly,

25 remand is further warranted for reconsideration of the opinions

26 of Drs. Chang and Babajanians in light of the severity of

27 ─────────────────────

28 resources/allodynia_when_touch_hurts_but_shouldnt/ (last visited
   Nov. 14, 2014).

1  Plaintiff's depression.  The ALJ may at that time reassess the
2  doctors' other findings and conclusions as well.

3       B.   Substantial Evidence Supports the ALJ's Finding That
4            Plaintiff's Hearing Loss Did Not Meet a Listing

5       Plaintiff contends that the ALJ erred in failing to find
6  that her hearing loss met Listing 2.10.  For the reasons
7  explained below, he did not.

8            1.   Applicable law

9       At step three of the sequential evaluation process, the ALJ
10 must evaluate the claimant's impairments to see if they meet or
11 medically equal those in the Listings.  See § 404.1520(d);
12 Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  Listed
13 impairments are those that are "so severe that they are
14 irrebuttably presumed disabling, without any specific finding as
15 to the claimant's ability to perform his past relevant work or
16 any other jobs."  Lester, 81 F.3d at 828.

17      The claimant has the initial burden of proving that an
18 impairment meets or equals a Listing.  See Sullivan v. Zebley,
19 493 U.S. 521, 530-33 (1990).  "To meet a listed impairment, a
20 claimant must establish that he or she meets each characteristic
21 of a listed impairment relevant to his or her claim."  Tackett,
22 180 F.3d at 1099.  "To equal a listed impairment, a claimant must
23 establish symptoms, signs and laboratory findings 'at least equal
24 in severity and duration' to the characteristics of a relevant
25 listed impairment, or, if a claimant's impairment is not listed,
26 then to the listed impairment 'most like' the claimant's
27 impairment."  Id. (citing § 404.1526).  Medical equivalence,
28 moreover, "must be based on medical findings"; "[a] generalized

13

assertion of functional problems is not enough to establish
disability at step three." Id. at 1100 (citing § 404.1526).

An ALJ "must evaluate the relevant evidence before
concluding that a claimant's impairments do not meet or equal a
listed impairment." Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir.
2001). The ALJ need not, however, "state why a claimant failed
to satisfy every different section of the listing of
impairments." Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th
Cir. 1990) (finding that ALJ did not err in failing to state what
evidence supported conclusion that, or discuss why, claimant's
impairments did not satisfy Listing). Moreover, the ALJ "is not
required to discuss the combined effects of a claimant's
impairments or compare them to any listing in an equivalency
determination, unless the claimant presents evidence in an effort
to establish equivalence." Burch v. Barnhart, 400 F.3d 676, 683
(9th Cir. 2005) (citing Lewis, 236 F.3d at 514).

An ALJ's decision that a plaintiff did not meet a Listing
must be upheld if it was supported by "substantial evidence."
See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th
Cir. 2006). Substantial evidence is "more than a mere scintilla
but less than a preponderance; it is such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion." Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir.
1997). When evidence is susceptible to more than one rational
interpretation, the Court must uphold the ALJ's conclusion as
long as substantial evidence supported it. Id.

2. Relevant facts

A January 22, 2007 hearing test showed that Plaintiff

14

suffered moderate to severe sensorineural hearing loss, with speech-reception thresholds of 50 decibels (dB) in both ears. (AR 419.)  Plaintiff had "excellent" word recognition "at elevated levels," and a new hearing aid was recommended.  (Id.) The test results were deemed to be of "good" reliability.  (Id.)

On May 28, 2009, an agency employee met with Plaintiff in person regarding her claim and reported that she was "hard of hearing" and that the employee "repeated questions and spoke in a loud tone."  (AR 164-65.)

On June 2, 2009, Plaintiff reported to cardiologist Joseph Scwhartz that her hearing level "waxes and wanes," leading him to suspect an association between her hearing loss and rheumatological issues.  (AR 410.)

On June 8, 2009, Plaintiff reported that she "can't hear" and that her hearing loss limited her social activities.  (See AR 167, 171-72 (noting that she tended to stay home and tried to read lips when watching TV or socializing), 174.)  The same day, Plaintiff's daughter reported that Plaintiff's neighbors and family had stopped talking to and calling her because of her hearing loss, Plaintiff followed spoken instructions "[n]ot well at all because she can't hear," and she required the speaker to "keep repeating" the instructions.  (AR 180.)

On July 7, 2009, testing showed Plaintiff capable of no speech discrimination at 95 dB in either ear.  (AR 621.)  The examiner reported air-conduction thresholds of approximately 70 dB and bone-conduction thresholds between approximately 90 and 120 dB in both ears.  (Id.)  The same day, Dr. Ayal Willner recommended, based on that test result and Plaintiff's report

15

that hearing aids did not help, that she be referred for a
cochlear implant.  (AR 614.)

On July 13, 2009, testing showed that Plaintiff suffered
"moderate to severe sensorineural [hearing] loss bilaterally"
that "impacts daily communication & functioning."  (AR 414, 418.)
Plaintiff demonstrated speech-reception thresholds of 65 dB and
60 dB in her right and left ears, respectively.  (AR 418.)  Her
speech discrimination was "significantly impaired" at 20% for
both ears, but her hearing was improved with a hearing aid.  (AR
414, 418.)  The results were deemed to be of "fair" reliability.
(AR 418.)  Plaintiff was recommended referral to an
otolaryngologist and use of binaural amplification hearing aids.
(Id.)

On July 31, 2009, examining psychiatrist Sohini Parikh
reported that Plaintiff was "hearing impaired in both ears."  (AR
420.)  Dr. Parihk "had to speak somewhat louder, but we were able
to communicate for the purposes of this evaluation."  (Id.)  Dr.
Parikh reported that Plaintiff got along well with family
members, maintained close friendships, and was able to focus her
attention during the examination and follow simple oral
instructions.  (AR 422.)

On August 4, 2009, examining internist Soheila Benrazavi
deduced that Plaintiff was hard of hearing because "I have to
raise my voice somewhat and she looks at my mouth for lip
reading."  (AR 428.)  Dr. Benrazavi noted that Plaintiff appeared
able to hear "a normal level of conversation" at times, perhaps
because the doctor was standing near Plaintiff's right ear.  (AR
431.)  Dr. Benrazavi found that Plaintiff had no communicative

16

limitations.  (AR 432.)

On August 31, 2009, Plaintiff was again seen by Dr. Willner, who found her to be "[e]ssentially unchanged" and again referred her for consideration for a cochlear implant.  (AR 613.)

On October 6, 2009, Plaintiff demonstrated speech-reception thresholds of 80 dB in each ear and speech discrimination of 84% and 80% in her right and left ear, respectively.  (AR 476.)  With hearing aids, Plaintiff's speech-reception threshold improved to 40 dB.  (Id.)  The examiner reported "moderately severe to severe sensorineural hearing loss" with "good word discrimination." (Id.)  Because hearing aids provided "speech reception threshold in the mild range with good word discrimination," the examiner recommended that Plaintiff use aids daily.  (Id.)

On November 18, 2010, Plaintiff demonstrated no speech discrimination at 95 dB.  (AR 637.)  The same day, Dr. Willner reported that Plaintiff suffered inner-ear nerve damage and that her sensorineural hearing loss "causes miscommunication and inability to concentrate as well as difficulty communicating." (AR 634-35.)  He opined that Plaintiff would sometimes need unscheduled breaks in an eight-hour workday but did not indicate that she would be absent from work because of her hearing impairment.  (AR 635.)  He recommended a cochlear implant.  (Id.)

Plaintiff testified at the January 6, 2011 hearing that "[h]earing aids don't work" but that she would have a consultation on a cochlear implant that month.  (AR 53-54.)  None of the additional evidence later submitted to the Appeals Council indicated that she had in fact done so.  (See generally AR 4, 206-10, 757-877; see also J. Stip. Ex. 1.)

17

1          3.   <u>Analysis</u>

2       To meet Listing 2.10, an individual with hearing loss not

3  treated with cochlear implantation must show either (A) "[a]n

4  average air conduction hearing threshold of 90 decibels or

5  greater in the better ear and an average bone conduction hearing

6  threshold of 60 decibels or greater in the better ear," or (B)

7  "[a] word recognition score of 40 percent or less in the better

8  ear determined using a standardized list of phonetically balanced

9  monosyllabic words."  20 C.F.R. pt. 404, subpt. P, app. 1,

10  § 2.10.  Plaintiff contends that Dr. Willner's findings on July

11  7, 2009, November 18, 2010, and September 21, 2011, that

12  Plaintiff had no speech discrimination bilaterally met Listing

13  2.10(B).[4]  (J. Stip. at 4.)  She further contends that the July

14  13, 2009 finding of 20% speech discrimination also met Listing

15  2.10(B).  (<u>Id.</u>)

16      As an initial matter, Plaintiff does not appear to have

17  requested that the ALJ consider Listing 2.10.  Indeed, even when

18  presenting additional limitations for consideration by the VE,

19  Plaintiff's counsel did not propose hearing restrictions beyond

20  those in the ALJ's hypothetical.  (<u>See</u> AR 78-79.)  Thus, even had

21  the ALJ failed to consider whether Plaintiff's hearing impairment

22  met a Listing, such failure would not have constituted reversible

23  error.  <u>See</u> <u>Burch</u>, 400 F.3d at 683; <u>Lewis</u>, 236 F.3d at 514

24  (finding ALJ's failure to consider equivalence not reversible

25  error when claimant did not offer any theory as to how his

26  _____

27      [4] The September 21, 2011 test results were not before the
ALJ, whose decision was issued two months earlier, and for the
28  reasons stated below, these results do not warrant remand for his
consideration.  (<u>See</u> <u>infra</u> Section V.B.4.)

18

impairments combined to equal Listing).  The ALJ did, however,
consider Listings included in Section 2.00 (hearing impairments),
and substantial evidence supports his finding that Plaintiff did
not establish that her hearing impairment met or equaled a
Listing.  (AR 36-37.)

      The ALJ found that although medical and other evidence
showed that Plaintiff had difficulty with speech discrimination
at certain volumes, her speech discrimination improved both at
elevated volumes and when she used hearing aids.  (AR 41.)  He
noted that a January 22, 2007 hearing test – admittedly before
the alleged onset date – showed "excellent" word recognition at
elevated volumes (AR 419), and that although the July 13, 2009
examiner noted 20% speech discrimination (AR 414, 418), an
October 6, 2009 report indicated no speech deficit and that
hearing aids provided good word discrimination (AR 476).  (AR
41.)  Indeed, although testing performed in Dr. Willner's office
suggested that Plaintiff's capacity for speech discrimination was
significantly impaired (see AR 621 (July 7, 2009 testing showing
air-conduction thresholds between 90 and 110 dB, bone-conduction
thresholds of approximately 70 dB, and no speech discrimination
at 95 dB in either ear); AR 637 (Nov. 18, 2010 testing showing
air-conduction thresholds between 80 and 100 dB and no speech
discrimination at 95 dB)), other auditory testing showed that she
retained a capacity for speech discrimination at elevated levels
and when using hearing aids (see AR 419 (Jan. 22, 2007 test
showing moderate to severe sensorineural hearing loss, speech-
reception thresholds of 50 dB in both ears, and "excellent" word
recognition "at elevated levels"); AR 414, 418 (July 13, 2009

testing showing speech-reception thresholds of 65 dB and 60 dB in right and left ears, speech discrimination "significantly impaired" at 20% for both ears, and hearing improved by hearing aids); AR 476 (Oct. 6, 2009 testing demonstrating speech-reception thresholds of 80 dB in each ear, speech discrimination of 84% and 80% in right and left ears, respectively, and speech-reception threshold of 40 dB with hearing aid, which examiner characterized as "good word discrimination")).

Such variation in the results of Plaintiff's hearing tests and the findings of her auditory examiners, some based on roughly contemporaneous examinations (see AR 414, 419, 476, 621), was a valid and reasonable basis to question the accuracy of test results indicating a total or near-total lack of speech discrimination – particularly given the subjective nature of an audiogram[5] and the evidence that Plaintiff exaggerated her symptoms in reports to other practitioners (see infra Section V.C); see also Booz v. Sec'y of Health & Human Servs., 734 F.2d 1378, 1380 (9th Cir. 1984) ("It is the ALJ's function to resolve conflicts in the evidence.").

Notably, Plaintiff did not proffer an opinion from any of the physicians who performed these auditory tests that her impairment met a Listing, or even confirming that the findings of

_____

[5] See L. Bishara et al., Correlations Between Audiogram and Objective Hearing Tests in Sensorineural Hearing Loss, Int'l Tinnitus J. 107 (1999) ("Owing to its subjective nature, behavioral pure-tone audiometry often is an unreliable testing method in uncooperative subjects (e.g., children, malingerers), and assessing the true hearing threshold becomes difficult."), available at: http://www.tinnitusjournal.com/imagebank/pdf/ v5n2a05.pdf.

zero and 20% speech discrimination were "determined using a standardized list of phonetically balanced monosyllabic words." 20 C.F.R. pt. 404, subpt. P, app. 1, § 2.10(B); see Laibach v. Astrue, No. ED CV 07-1400-OP, 2009 WL 650606, at *3 (C.D. Cal. Mar. 5, 2009) (noting that "audiograms are not self-explanatory" but rather require findings discussing their results).  As the ALJ noted, although the examiner whose testing found only 20% speech discrimination opined that Plaintiff's impairment "impacts daily communication & functioning" (AR 414), she did not quantify the impact (AR 41).  Moreover, the examiner's indication of only "fair" reliability of the test results and recommendation of further medical evaluation, clearance for hearing aids, and annual hearing exams did not suggest a conclusive finding of disabling hearing loss.  (AR 418.)  Similarly, upon Plaintiff's initial evaluation by Dr. Willner's office, the finding of no speech discrimination was accompanied by a recommendation that Plaintiff consider hearing aids (see AR 621), which Dr. Willner appears to have amended based only on Plaintiff's report that hearing aids did not help (AR 614) – which was inconsistent with the findings of some hearing examiners (see AR 414, 476) and further undermined by the ALJ's finding that Plaintiff was not entirely credible (see infra Section V.C); Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1228 (9th Cir. 2009) (reasonable to discount physician's recommendation based on Plaintiff's subjective characterization of symptoms when ALJ has determined Plaintiff's allegations are not entirely credible).  Thus, the interpretation of Plaintiff's test results is not so straightforward as she suggests.  Moreover, as the ALJ noted, the

record contains evidence that Plaintiff was able to hear better than her more extreme test results suggested.   <u>See</u> 20 C.F.R. pt. 404, subpt. P, app. 1, § 2.00(B)(1)(a) ("We will consider your test scores together with any other relevant information we have about your hearing, including information from outside of the test setting.").

The ALJ noted inconsistencies between Plaintiff's and her daughter's reports of Plaintiff's hearing difficulties and the reports of agency and medical examiners that Plaintiff was able to hear and understand them when they spoke at higher volumes. (AR 41.)   For instance, Plaintiff's daughter reported that hearing loss limited Plaintiff's social life and that she followed spoken instructions "[n]ot well at all because she can't hear" and required the speaker to "keep repeating" the instructions.   (AR 180; <u>see also</u> AR 66 (Plaintiff testifying that she was unable to hear siren when driving); AR 171-72 (Plaintiff stating that she tried to read lips when watching TV or socializing).)   Agency and medical examiners, however, were reportedly able to converse with Plaintiff effectively by speaking at elevated volumes.   (<u>See</u> AR 164-65 (on May 28, 2009, agency employee reported that Plaintiff was "hard of hearing" and that employee thus "repeated questions and spoke in a loud tone"); AR 420, 422 (on July 31, 2009, examining psychiatrist reported that Plaintiff was "hearing impaired in both ears," that doctor "had to speak somewhat louder, but we were able to communicate for the purposes of this evaluation," and that Plaintiff was able to follow simple oral instructions); AR 428, 431-32 (on Aug. 4, 2009, examining internist deduced that

Plaintiff was hard of hearing because "I have to raise my voice somewhat and she looks at my mouth for lip reading," noting that Plaintiff appeared able to hear "a normal level of conversation" at times, perhaps because the doctor was standing near Plaintiff's right ear, and finding that Plaintiff had no communicative limitations); see also AR 410 (on June 2, 2009, Plaintiff reported to cardiologist that her hearing level "waxes and wanes").) Moreover, the ALJ himself interviewed Plaintiff at the January 6, 2011 hearing, at which Plaintiff responded appropriately to most questions, requesting that the ALJ repeat himself only occasionally. (See AR 52-59, 62-70.) The ALJ thus found that Plaintiff suffered from a severe hearing impairment but that her impairment did not preclude conversation at an elevated volume or with hearing aids. (AR 41.)

Although Plaintiff reported that hearing aids did not help her (see, e.g., AR 53-54, 614; J. Stip. Ex. 1 at 1), other evidence demonstrated that they did (see AR 414, 476, 621). Moreover, the ALJ noted that she had not pursued a possible cochlear implant with urgency. (AR 41.) Dr. Willner referred Plaintiff for an implant consultation in July and August 2009 (AR 613-14) and continued to recommend an implant in November 2010 (see AR 635), but as of the January 6, 2011 hearing, Plaintiff had not obtained an implant or determined, based on consultation with a specialist, that it was not likely to help or would be too invasive (see AR 53, 55 (Plaintiff testifying that she had "more"

consultation scheduled)).[6]  The ALJ thus found that Plaintiff's lack of urgency in investigating the recommended treatment for her hearing loss indicated that her hearing impairment was not as significant as alleged.  (AR 41); see Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (ALJ may discount allegations of disabling impairment in light of "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment").

The ALJ's determination that Plaintiff failed to meet her burden to show an impairment that met or equaled Listing 2.10(B) was thus supported by substantial evidence.  See Sandgathe, 108 F.3d at 980.  Remand is not warranted on this basis.

### 4.   The additional evidence regarding Plaintiff's hearing impairment does not warrant remand

Plaintiff further contends that "[t]he Appeals Council committed reversible error in failing to consider new and material evidence" regarding her hearing impairment that she submitted with her request for review.  (J. Stip. at 32.) Specifically, Plaintiff's counsel indicated in a February 29, 2012 letter to the Appeals Council that she was enclosing additional exhibits, including "[a] complete otologic exam and audiometric testing performed by Ayal Willner, M.D., dated September 27, 2011," and an updated medication list.  (AR 206; see J. Stip. Ex. 1 (Sept. 27, 2011 Willner letter and Sept. 21, 2011 hearing-test results)).  Although the Appeals Council noted

---

[6] The ALJ stated that there was no indication that Plaintiff had obtained a cochlear implant "nearly two years later," presumably meaning that he had received no updated records as of the time of his July 15, 2011 decision.  (AR 41.)

its receipt and inclusion in the record of counsel's letter and
older medical records from NSR Medical Group (AR 4-5), the
council did not indicate receipt or consideration of the
September 2011 materials described in counsel's letter, and
neither of those documents appears in the record.  An updated
medication list was added to the record; it immediately precedes
counsel's letter but is numbered as a separate exhibit.  (See AR
205.)

### a. *Applicable law*

The Commissioner's regulations permit claimants to submit
new and material evidence to the Appeals Council and require the
council to consider that evidence in determining whether to
review the ALJ's decision.   See Brewes v. Comm'r of Soc. Sec.
Admin., 682 F.3d 1157, 1162 (9th Cir. 2012).  "If new and
material evidence is submitted, the Appeals Council shall
consider the additional evidence only where it relates to the
period on or before the date of the administrative law judge
hearing decision."  See § 404.970(b); Brewes, 682 F.3d at 1162 &
n.3; Bates v. Sullivan, 894 F.2d 1059, 1064 (9th Cir. 1990).  The
Appeals Council "will grant the request for review if it finds
that the [ALJ's] action, findings, or conclusion is contrary to
the weight of the evidence currently of record."  Brewes, 682
F.3d at 1162 (alteration in original and internal quotation marks
omitted) (citing § 404.970(b)).

This Court "[does] not have jurisdiction to review a
decision of the Appeals Council denying a request for review of
an ALJ's decision, because the Appeals Council decision is a non-
final agency action."  Id. at 1161.  When, however, the Appeals

25

1  Council fails to consider new and material evidence as required,
2  remand to the ALJ is appropriate so that he can reconsider his
3  decision in light of the additional evidence.  Taylor v. Comm'r
4  of Soc. Sec. Admin., 659 F.3d 1228, 1233 (9th Cir. 2011); see
5  also Lamp v. Astrue, 531 F.3d 629, 633 (9th Cir. 2008).  To
6  justify remand, a claimant must show that the evidence is both
7  new and material to determining her disability and that she had
8  good cause for having failed to produce that evidence earlier.
9  See 42 U.S.C. § 405(g); Mayes v. Massanari, 276 F.3d 453, 462
10 (9th Cir. 2001).  "New evidence is material if it 'bear[s]
11 directly and substantially on the matter in dispute' and if there
12 is a 'reasonabl[e] possibility that the new evidence would have
13 changed the outcome of the . . . determination.'"  Bruton v.
14 Massanari, 268 F.3d 824, 827 (9th Cir. 2001) (as amended)
15 (quoting Booz, 734 F.2d at 1380).

                          b. *Analysis*

17      The Appeals Council does not appear to have considered the
18 September 2011 Willner materials.  It is possible, as the
19 Commissioner suggests (J. Stip. at 33), that the council excluded
20 the documents from review because they postdated the ALJ's July
21 15, 2011 decision by two months.  See § 404.970(b).  Given that
22 the materials were neither added to the record nor returned to
23 Plaintiff for use in a future application, however, it is equally
24 likely that they were overlooked or that Plaintiff's counsel
25 failed to enclose them.[7]  Whether intentional or not, the

27      [7] The Commissioner explains that when the Appeals Council
   deems additional evidence not relevant to the time period under
28 consideration, it generally returns the materials to the claimant
   for use in a future application.  (J. Stip. at 35 n.7.)

                              26

1  apparent exclusion of the Willner materials from the council's

2  review does not warrant remand.

3       The additional materials do not offer "new" evidence

4  regarding the severity of Plaintiff's impairment during the

5  relevant period.  The September 21, 2011 hearing test postdates

6  the ALJ's decision, so it does not "relate[] to the period on or

7  before the date of the administrative law judge hearing

8  decision." § 404.970(b).  The test also is not "new" evidence

9  because its results largely confirm those reported by Dr.

10  Willner's office following two other auditory tests, both of

11  which were included in the record.  (Compare J. Stip. Ex. 1 with

12  AR 621, 637; see also J. Stip. Ex. 1 at 1 (noting that 2011

13  testing showed slight improvement in bone- and air-conduction

14  thresholds over 2009 testing)); see Muro v. Astrue, No. EDCV

15  12-0058-DTB, 2013 WL 327468, at *3 (C.D. Cal. Jan. 29, 2013)

16  (noting that "to merit remand for new and material evidence,"

17  evidence must be "new, and not merely cumulative").  The

18  September 27, 2011 letter suffers from the same defects as the

19  test results.  Although Dr. Willner describes the results of

20  Plaintiff's July 7, 2009 audiogram, which was performed during

21  the relevant period, he does not opine upon the reliability of

22  her test results or the impact of Plaintiff's hearing loss on her

23  functioning and thus offers no additional insight beyond the

24  information in the record.

25       The September 2011 documents also are not "material" because

26  there is not a "reasonable possibility" that they would have

27  altered the ALJ's decision.  See Bruton, 268 F.3d at 827.  As

28  discussed above (see supra Section V.B), the ALJ based his

27

finding that Plaintiff's hearing loss was severe but not disabling on the varying evidence concerning the degree of her impairment.   The record before the ALJ contained several hearing tests – among them the tests performed in Dr. Willner's office in 2009 and 2010 – as well as informal assessments of Plaintiff's capacity for conversation.   Although all of the evidence showed that Plaintiff suffered a hearing impairment, some auditory testing showed that she retained a capacity for speech discrimination at elevated levels and when using a hearing aid. (See AR 414, 418, 419, 476.)   Similarly, agency and medical examiners were reportedly able to converse with Plaintiff effectively by speaking at elevated volumes, and the ALJ appeared able to question Plaintiff effectively by addressing her at an elevated volume.   (See AR 164-65, 420, 422, 428, 431-32; see generally 52-59, 62-70 (hearing transcript in which Plaintiff sought only occasional clarification of questions).)   Although Dr. Willner's evidence indicated that Plaintiff's capacity for speech discrimination was more significantly impaired (see AR 613, 614, 634-35, 637 (test results and findings of Dr. Willner); see also AR 66 (Plaintiff testifying that she was unable to hear siren when driving)), the ALJ noted both Plaintiff's testimony and Dr. Willner's findings and reasonably found that the record as a whole failed to establish a disabling hearing impairment (see AR 41).

Because the September 2011 testing does not relate to the relevant period and the letter was largely cumulative and thus not reasonably likely to have altered the ALJ's determination,

1   remand is not warranted.[8]

2        C.   Any Error in Assessing Plaintiff's Credibility Was

3             Harmless

4        Plaintiff contends that the ALJ failed to provide legally

5   sufficient reasons for rejecting Plaintiff's testimony.  (J.

6   Stip. at 25-27, 31-32.)  In fact, the ALJ cited clear and

7   convincing reasons for discounting Plaintiff's statements even

8   though his finding of malingering relieved him of the burden of

9   doing so.

10            1.   Applicable law

11       An ALJ's assessment of symptom severity and claimant

12  credibility is entitled to "great weight."  See Weetman v.

13  Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

14  F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

15  believe every allegation of disabling pain, or else disability

16  benefits would be available for the asking, a result plainly

17  contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674

18  F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks

19  omitted).

20       In evaluating a claimant's subjective symptom testimony, the

21  ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d

22  at 1035-36.  "First, the ALJ must determine whether the claimant

23  has presented objective medical evidence of an underlying

24  impairment [that] could reasonably be expected to produce the

25  pain or other symptoms alleged."  Id. at 1036 (internal quotation

26  _____

27       [8] Because the September 2011 documents are neither new nor
    material, the Court does not address the existence of good cause
28  for Plaintiff's failure to submit them earlier.  (See J. Stip. at
    34 n.6 (citing Mayes, 276 F.3d at 462).)

29

marks omitted).  If such objective medical evidence exists, the
ALJ may not reject a claimant's testimony "simply because there
is no showing that the impairment can reasonably produce the
degree of symptom alleged."  Smolen, 80 F.3d at 1282 (emphasis in
original).  When the ALJ finds a claimant's subjective complaints
not credible, the ALJ must make specific findings that support
the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th
Cir. 2010).

Absent affirmative evidence of malingering, those findings
must provide "clear and convincing" reasons for rejecting the
claimant's testimony.  Lester, 81 F.3d at 834.  If the ALJ's
credibility finding is supported by substantial evidence in the
record, the reviewing court "may not engage in second-guessing."
Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).

2.   Analysis

The ALJ noted evidence from treating doctor Babak Zamiri and
examining doctor Ahmad Riahinejad that Plaintiff exaggerated her
symptoms and limitations.[9]  (AR 35, 38-39.)  Dr. Zamiri noted
upon his initial rheumatology consultation with Plaintiff that
"she seemed to exaggerate her pain level and was very
histrionic."  (AR 38-39, 704.)  Dr. Riahinejad reported that
Plaintiff's score on a memory test "rules out malingering but
indicates a mild sub-optimal performance" and noted that her
score on a different test, for memory malingering, "falls into
the malingering range."  (AR 731, 733.)  Plaintiff asserts

---

[9] Although Dr. Riahinejad's examination included assessment
of her depression, the evidence of malingering pertained to
testing of her cognitive and intellectual function, so the Court
relies on it despite the step-two error concerning depression.

without citation that "testing indicated that there was no
malingering" but rather that "tests were hampered by
[Plaintiff's] severe hearing loss." (J. Stip. at 26.) Although
Dr. Riahinejad speculated that her hearing impairment might
account for her IQ scores being "slightly depressed" (AR 733), he
did not dismiss the evidence of malingering on the other test.

The ALJ thus reasonably found that the evidence showed
malingering, which relieved him of the burden of providing clear
and convincing reasons for discounting Plaintiff's credibility.
(AR 35, 38-39); <u>see</u> <u>Lester</u>, 81 F.3d at 834; <u>Bagoyan Sulakhyan v.</u>
<u>Astrue</u>, 456 F. App'x 679, 682 (9th Cir. 2011). Nonetheless, the
ALJ gave clear and convincing reasons for discounting her
credibility.[10]

For instance, as noted above, the ALJ emphasized that
despite her allegations of a disabling hearing impairment not
improved by hearing aids and mid-2009 and later referrals to see
a specialist concerning a cochlear implant, Plaintiff still had
not done so as of the January 6, 2011 hearing. (AR 41.)
Plaintiff contends that the ALJ erred because it was not clear
whether a cochlear implant would improve her hearing (J. Stip. at
26), but she offers no explanation for her failure to pursue
examination by a specialist, which presumably would offer greater
clarity regarding potential outcomes. Indeed, although she
testified that she would have "more" cochlear-implant
consultation in January 2011 (<u>see</u> AR 53-54), she included no

---

[10] As explained below, none of those reasons related to
Plaintiff's claims of depression. Thus, the ALJ's erroneous
finding that her depression was not severe did not affect his
assessment of her credibility.

evidence from any such consultation in the materials she submitted to the Appeals Council.  And although Plaintiff testified that her doctors were hesitant to provide the implant "right now" "with all the other impairments that I have," there is no evidence of such concern in the record, nor does that explain why Plaintiff had not sought to confirm her candidacy for an implant.

That Plaintiff failed to seek information regarding what was potentially the sole treatment for her hearing loss was a valid basis upon which to discount her allegations.  See Molina, 674 F.3d at 1112 (in determining credibility, ALJ may consider "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" (internal quotation marks omitted)); Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007); SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) (claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure").[11]

---

[11] The ALJ noted that although Plaintiff's son rubbed her body with arthritis cream to relieve her physical pain, the record contained "no indication that she has sought massage or chiropractic care to help alleviate her pain, which is an indication that her pain is not as significant as she alleged." (AR 38.)  Given, however, that none of Plaintiff's doctors appear to have recommended massage or chiropractic treatment, this may not have been a valid basis upon which to discount her credibility.  Because the ALJ gave other clear and convincing reasons for discrediting Plaintiff's statements, any error was harmless.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1163 (9th Cir. 2008) (error harmless when inconsequential to ultimate credibility determination).

1    The ALJ also noted that Plaintiff's alleged onset date of
2    January 1, 2008, bore no apparent relationship to the onset or
3    significant worsening of any of her impairments.  He noted that
4    her treatment for cubital-tunnel syndrome and right-shoulder
5    impairment had waned by January 2008, suggesting that neither of
6    these impairments caused significant limitations as of the
7    alleged onset date.  (AR 39-40.)  Nor did Plaintiff's hearing or
8    shoulder problems appear to be disabling in January 2008.
9    Plaintiff testified that she was "let go" from her secretarial
10   position at approximately that time but "was still trying to
11   work," so she sought training as a certified nursing assistant.
12   (AR 68.)  She was unable to perform that job, however, because
13   her hearing caused miscommunication and she suffered a left-
14   shoulder rotator-cuff tear that rendered her unable to move
15   patients.  (AR 68-69; see AR 395.)  Plaintiff further testified
16   that it was not until she found herself unable to perform the CNA
17   job that she determined that she was unable to work and applied
18   for DIB.  (AR 37; see AR 68-69.)  The ALJ therefore found that
19   Plaintiff "performed some work activities (albeit at less than
20   presumptive substantial gainful activity levels)" after her
21   alleged onset date, indicating that the true onset date was May
22   27, 2009.  (AR 37.)  He also found that this inconsistency
23   undermined the credibility of Plaintiff's allegations.  (Id.)
24   An unsuccessful attempt to work during a symptom-free period
25   is not an adequate basis for discrediting a claimant's testimony
26   when evidence establishes the existence of a medically
27   determinable impairment that could cause the disabling symptoms.
28   Santana v. Astrue, No. CV 11-7340-MLG, 2012 WL 1155937, at *3

1  (C.D. Cal. Apr. 4, 2012); see also Lester, 81 F.3d at 833 (noting
2  that "occasional symptom-free periods — and even the sporadic
3  ability to work — are not inconsistent with disability").
4  Plaintiff testified, however, that after she was terminated from
5  her longtime secretarial position, she was able to undertake CNA
6  training and – until her early-2009 left-shoulder injury – was
7  still able to work.  A claimant's ability to work after her
8  alleged disability onset is a valid basis for discounting her
9  credibility.  See Bray, 554 F.3d at 1227; see also Morillas v.
10 Astrue, 371 F. App'x 880, 882 (9th Cir. 2010) (finding that ALJ
11 properly considered claimant's activities, including training to
12 be medical assistant, in assessing credibility of her pain
13 allegations).  Moreover, any error in discounting Plaintiff's
14 credibility on this basis was harmless given the finding and
15 evidence of malingering.  See Carmickle v. Comm'r, Soc. Sec.
16 Admin., 533 F.3d 1155, 1163 (9th Cir. 2008) (error harmless when
17 inconsequential to ultimate credibility determination).
18       Remand is not warranted on this basis.
19       D.   Remand for Further Proceedings Is Appropriate
20       When, as here, the ALJ erred in finding that an impairment
21 was not severe and possibly in the assessment of medical opinion
22 evidence, the Court generally has discretion to remand for
23 further proceedings.  See Harman v. Apfel, 211 F.3d 1172, 1175-78
24 (9th Cir. 2000).  When no useful purpose would be served by
25 further administrative proceedings, however, or when the record
26 has been fully developed, it is appropriate under the
27 "credit-as-true" rule to direct an immediate award of benefits.
28 Id. at 1179 (noting that "the decision of whether to remand for

34

1  further proceedings turns upon the likely utility of such

2  proceedings"); see also Garrison v. Colvin, 759 F.3d 995, 1019-20

3  (9th Cir. 2014) (noting that credit-as-true rule applies to

4  medical opinion evidence).

5       Under the credit-as-true framework, three circumstances must

6  be present before the Court may remand to the ALJ with

7  instructions to award benefits: "(1) the record has been fully

8  developed and further administrative proceedings would serve no

9  useful purpose; (2) the ALJ has failed to provide legally

10 sufficient reasons for rejecting evidence, whether claimant

11 testimony or medical opinion; and (3) if the improperly

12 discredited evidence were credited as true, the ALJ would be

13 required to find the claimant disabled on remand."  Garrison, 759

14 F.3d at 1020.  When, however, the ALJ's findings are so

15 "insufficient" that the Court cannot determine whether the

16 rejected testimony should be credited as true, the Court has

17 "some flexibility" in applying the credit-as-true rule.  Connett

18 v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003); see also

19 Garrison, 759 F.3d at 1020 (noting that Connett established that

20 credit-as-true rule may not be dispositive in all cases).  This

21 flexibility should be exercised "when the record as a whole

22 creates serious doubt as to whether the claimant is, in fact,

23 disabled within the meaning of the Social Security Act."

24 Garrison, 759 F.3d at 1021.

25      Here, the record does not reveal whether Plaintiff's

26 depression imposes greater limitations upon her ability to work

27 than those found by the ALJ.  Accordingly, the first of the three

28 requirements for a remand for benefits has not been met.

Therefore, remand is appropriate for the ALJ to consider Plaintiff's limitations in light of the severity of Plaintiff's mental impairment and his reassessment of the opinions of Drs. Chang and Babajanians.

**VI.   CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that (1) the decision of the Commissioner is REVERSED; (2) Plaintiff's request for remand is GRANTED; and (3) this action is REMANDED for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment on all parties or their counsel.

DATED: November 25, 2014

JEAN ROSENBLUTH
U.S. Magistrate Judge

36